**Raymond Clark FERRY, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 1182S429.**

Supreme Court of Indiana.

Sept. 14, 1983.

David W. Weigle, Hammond, for appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Judge.

Appellant was charged with knowing or intentional murder, as defined in I.C. § 35–42–1–1(1) [Burns 1979 Repl.], and felony murder, as defined in I.C. § 35–42–1–1(2) [Burns 1979 Repl.]. He was found guilty by a jury on both counts. The court imposed a sentence of fifty-eight years on Count I only.

The facts are these. Appellant and two accomplices, Tom Urcan and Rocco Lupino, planned to rob a wholesale jewelry salesman, the decedent, one Giovanni Macaddino. Urcan was the owner of a jewelry store in Dyer and was expecting Macaddino to visit the store on the evening of May 9, 1980, carrying a large quantity of jewelry. On that evening and according to plan, appellant and Lupino burst into the store after Macaddino had entered it, brandishing firearms and feigning a robbery. Appellant handcuffed Macaddino and took him into a back room where he then strangled Macaddino to death with a sock. Lupino disposed of the body, but shortly thereafter he and appellant decided it needed to be moved. Appellant suggested the body be buried in some land owned by his father in Grayson County, Kentucky. Accordingly, the pair drove to Kentucky in separate cars. Lupino buried the body in a location pointed out to him by appellant. The body was discovered by a tenant farmer renting some land from appellant's father.

Appellant was eventually arrested by Illinois authorities for another crime and was incarcerated in Chicago. The record does not show when this arrest occurred, but appellant was in jail by August of 1980. By that time federal authorities had already become involved in the investigation into the murder of Macaddino, suspecting a connection between the crime and some federal violations, including interstate transportation of stolen property and some racketeering offenses. Also, it was by that time learned appellant's father was the owner of the land on which Macaddino's body was found. Additionally, an associate of appellant's had implicated him in Macaddino's murder.

Appellant claims the trial court erred in denying his Motion to Suppress his statements made to FBI agents while he was in jail in Chicago and also his testimony before a federal grand jury, and in admitting those same statements into evidence at his trial over his objection. The record shows FBI agents conducted custodial interrogations of appellant on seven occasions between August 21 and October 2, 1980. Appellant's statements were made during the first of these interviews on August 21 and the last one on October 2. These statements were reduced to writing and corrected and signed

by appellant. These written statements were admitted into evidence at appellant's trial. In the August 21 statement appellant related the planning of the robbery and the murder of Macaddino. He named Lupino as the actual perpetrator of the homicide. In the October 2 statement, however, he verified as accurate all of the August 21 statement but admitted it was he, not Lupino, who strangled Macaddino. At the grand jury hearing, a transcript of which was admitted into evidence at his trial, appellant admitted to the same facts as he had admitted to the FBI agents in the statement of October 2.

The basic requirement for admitting the defendant's statements made to police during a custodial interrogation is that such statement must have been voluntarily made as the product of a rational intellect and a free will, without compulsion or inducement of any sort serving to overbear the will of the accused. *Taylor v. State,* (1980) Ind., 406 N.E.2d 247; *Brewer v. State,* (1979) 271 Ind. 122, 390 N.E.2d 648. All the circumstances surrounding the making of the statement are to be considered in determining the voluntariness of the statement. *Bumgardner v. State,* (1981) Ind., 422 N.E.2d 1244; *Turner v. State,* (1980) Ind., 407 N.E.2d 235; *Brewer, supra.*

The State bears the burden of proving the voluntariness of the statement beyond a reasonable doubt. *Kern v. State,* (1981) Ind., 426 N.E.2d 385. *Bumgardner, supra.*

Appellant first challenges the court's ruling on the grounds the evidence showed the statements were made outside the presence of the attorneys who were representing him at the time they were made and without notice to them that the interviews were being conducted. Appellant cites *Kern, supra,* for the proposition that custodial interrogation of the accused without notice to counsel having been given is a significant factor weighing against a determination that the statement was voluntary, even if the accused waived the right to have counsel present during the interrogation.

Appellant ignores, however, the overwhelming evidence in the record that not only did he repeatedly waive the right to have counsel present at the commencement of each interrogation session, and also at the commencement of the grand jury hearing, but also that he repeatedly asked that his attorneys not be notified that he was going to be making statements to the FBI and the grand jury. Appellant's wishes in this regard were premised on a belief his attorneys had connections with organized crime, and that if it was known by the organized crime syndicate that he was talking to the FBI, he would be killed to keep him from revealing what he knew about organized criminal activity in northern Illinois and Indiana. Moreover, there was evidence adduced in the suppression hearing that both the FBI agents and the federal deputy district attorney who spoke with appellant before the grand jury hearing offered to have different attorneys consult with him before any interviews would be conducted and also to be present during the interviews, and that he specifically declined this offer as well. There is substantial evidence of probative value to support the trial court's ruling that appellant's statements were voluntarily made.

Appellant's citation to *Edwards v. Arizona,* (1980) 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, is unpersuasive. In that case the Supreme Court held that after an accused has been taken into custody, been advised of his right to counsel and stated he does not wish to be interrogated without counsel present, and then police initiate a second interrogation during which the accused makes an incriminating statement, the statement is inadmissible. The Court held this was so even if prior to the second interrogation the accused manifested a willingness to talk to police without counsel present, contrary to his earlier assertion that he did not want to be interrogated without counsel present. The evil the Court identified was in approaching the accused a second time when after the prior approach he stated he did not want to talk to police without an attorney being present. Only if the accused initiates a second con-

tact with police after earlier stating that he did not want to talk to them without invoking the right to counsel can the waiver of the right at the second or later interrogation be of any effect. *Id.*

Appellant points out the evidence in this case is undisputed that all the interrogations were police initiated. There is no evidence in the case at bar appellant ever told police he did not want to talk to them without an attorney being present. Rather, each time he was informed of the right to counsel he waived the right. Appellant gives *Edwards, supra,* an overly broad reading in construing it to stand for the proposition that police are limited to initiating only one contact with the accused for interrogation purposes.

Appellant challenges the ruling on voluntariness of the statements on ground he was "mentally and emotionally subnormal" at the time the statements were made, and thus the statements were not the products of a rational intellect, nor can it be said he knowingly and intelligently waived the right to counsel. *See, e.g., Kern, supra; Lonson v. State,* (1980) Ind., 406 N.E.2d 256. The factual basis for this claim is that the record shows appellant was found to be incompetent to stand trial in February of 1981, and that intelligence tests given to him at various times showed he had a "borderline I.Q." of between 71 and 79.

Appellant's contentions in this regard are unpersuasive. He overlooks the rule that in reviewing the trial court's ruling on admission of a statement by the accused made during custodial interrogation we consider only the evidence most favorable to the State to see if the burden of proof of voluntariness beyond a reasonable doubt was met. *Kern, supra; Bumgardner, supra.* Testimony from FBI agent Scigalski and also United States Deputy district attorney Gary Shapiro who talked to appellant before he appeared before the grand jury provided substantial evidence from which the trial court could have concluded appellant's statements and his waiver of the right to counsel were not due to inherent or extraneous impairment of his mental faculties. These witnesses testified generally that on each occasion they spoke with appellant he appeared coherent and rational, uninfluenced by drugs or alcohol, that he was not violent, hysterical, or mute, that he was in their opinion legally sane, and that he orally expressed his understanding of the right to counsel and his wish to waive it in addition to signing waiver forms. Appellant's contention that the fact he was found to be incompetent to stand trial as of January, 1981, compels the inference that this same mental state was operative approximately three months earlier when he gave the statements is not persuasive. The state of mind respecting the defendant's competency to stand trial is recognized as subject to change over time. *See Malo v. State,* (1977) 266 Ind. 157, 361 N.E.2d 1201. *See also* I.C. § 35–5–3.1–2 [Burns 1979 Repl.] (repealed by Indiana Acts 1981, P.L. 298, § 9). Considering this and the testimony of witnesses Scigalski and Shapiro relative to their assessments of the mental state of appellant when he made the challenged statements, it can hardly be said the State failed to meet its burden of proof of voluntariness of the statements with regard to appellant's state of mind at the time the statements were made.

Finally, appellant contends the statements he gave were involuntary due to the State's failure to establish the length of time between his arrest and when, if ever, he was brought before a judge in either Federal or Illinois state court.

The existence of delay between detention of an accused by police and his appearance before a magistrate is a factor to be considered in determining the voluntariness of a statement made to police during such period of detention. *Allen v. State,* (1982) Ind., 431 N.E.2d 478; *Battle v. State,* (1981) Ind., 415 N.E.2d 39. A statement obtained from an accused in detention before he is brought before a magistrate may be inadmissible as involuntary, depending on the length of the delay and other factors as well. *See, e.g., Blatz,* (1978) 175 Ind.App. 26, 369 N.E.2d 1086.

However, in the case at bar appellant has waived the issue of involuntariness of the statement on this ground. It was not until the appellate brief was filed that appellant first suggested this factual basis for a finding of involuntariness. We will not consider this argument for the first time on appeal. *Phelan v. State,* (1980) Ind., 406 N.E.2d 237; *Gee v. State,* (1979) 271 Ind. 28, 389 N.E.2d 303; *Bell v. State,* (1977) 267 Ind. 1, 366 N.E.2d 1156.

We hold the trial court did not err in overruling appellant's Motion to Suppress his statements made to police and his grand jury testimony nor in admitting the same into evidence at this trial.

Appellant claims the trial court erred in finding him competent to stand trial. Appellant was found incompetent to stand trial on February 21, 1981, said finding being based on the reports of two psychiatrists appointed to examine him. After commitment to the Department of Mental Health, the State moved for another competency hearing, claiming that appellant was malingering and feigning mental illness to avoid standing trial. A second hearing on competency was held after appellant was examined by five psychiatrists. The trial court ruled that appellant had the ability to understand the proceedings and to assist in the preparation of his defense. Appellant again moved for a competency determination shortly before trial was held. The court held that hearing on the morning trial commenced, June 14, 1982, and again found him competent.

Appellant challenges the sufficiency of the evidence in support of the trial court's determination.

The hearing on competency with which we must be concerned is the last one held the morning before trial was to begin on June 14, 1982. At that hearing Doctors Lee Periolat and Mohammad Arshad, psychiatrists who were initially appointed to examine appellant and were later reappointed for the same purpose, testified as to their opinions at that time. Basically Dr. Periolat testified he found appellant to still be incompetent to stand trial, as he had found on all previous occasions when he had been asked to give an opinion on the question. Dr. Arshad, however, testified he believed appellant to be presently competent to stand trial. He stated the seemingly bizarre and irrational behavior appellant displayed in his most recent interviews of him were the conscious product of a malingering effort on appellant's part to avoid standing trial.

The trial court's determination of competency to stand trial involves questions of fact and is reversible on appeal only where the court's conclusion is clearly erroneous, unsupported by the facts and circumstances before the court and the reasonable inferences that can be drawn therefrom. *Howard v. State,* (1976) 265 Ind. 503, 355 N.E.2d 833. Where there is conflicting evidence from physicians as to competency, we generally will not overturn the trial court's determination merely because there is such a conflict. *Bobbitt v. State,* (1977) 266 Ind. 164, 361 N.E.2d 1193. In light of these rules and considering Dr. Arshad's testimony, we hold the trial court's determination is supported by sufficient evidence.

Appellant points to evidence in the record that his attorney stated to the trial judge near the end of the trial that he had difficulty in communicating with appellant and that this made it difficult to prepare for trial. The test of competency to stand trial, however, is whether the defendant has the ability to assist in the preparation of his defense (and also to understand the nature of the proceedings). *Mato v. State,* (1982) Ind., 429 N.E.2d 945; *Carter v. State,* (1981) Ind.App., 422 N.E.2d 742; I.C. § 35–5–3.1–1(a). This is quite different than whether the defendant is willing to assist in the preparation of his defense. The defendant who declines to help his attorney in the preparation of his defense is perhaps unwise, or even foolish, but he is not necessarily on that basis incompetent to stand trial. *See, e.g., Brown v. State,* (1956) 235 Ind. 186, 131 N.E.2d 777.

Appellant claims the trial court erred in admitting State's Exhibits Four and Eight.

Appellant contends these photographs of the body of the decedent were introduced solely to inflame the passion of the jury and prejudice the jury against him, and moreover that the photographs had no probative value whatsoever.

State's Exhibit Four is a color photograph of the burial site of Macaddino's body. It was taken from a distance of only one or two feet above the ground. The knees or a knee and the skull of the decedent can be seen protruding from the soil, but no other body parts are visible. State's Exhibit Eight is a black and white photograph of the body of the decedent from the waist up as it lay on an autopsy table.

The admissibility of photographs of the body of the victim of a homicide turns on the question of relevancy. *Askew v. State,* (1982) Ind., 439 N.E.2d 1350; *Moore v. State,* (1981) Ind., 414 N.E.2d 558; *Drollinger v. State,* (1980) Ind., 408 N.E.2d 1228. Photographs are relevant if they depict objects or scenes that a witness would be permitted to describe verbally. *Id.* If the photograph is relevant, then only if its tendency to inflame the passions of the jury due to its gruesomeness clearly outweighs its relevancy is it reversible error to admit it into evidence. *Askew, supra; Graves v. State,* (1980) Ind., 400 N.E.2d 139; *Brandon v. State,* (1978) 268 Ind. 150, 374 N.E.2d 504. The fact of the gruesomeness of the photograph is not sufficient reason, in and of itself, to require its exclusion from evidence. *Akins v. State,* (1981) Ind., 429 N.E.2d 232.

In the case at bar we see no error in admitting the challenged exhibits into evidence. Testimony as to the location of the body and the manner in which it was discovered, and the photograph corroborating that testimony, were admissible for the purpose of establishing the *corpus delicti* of the crime, in order that appellant's confession itself could be admitted into evidence. *See, e.g., Fleener v. State,* (1980) Ind., 412 N.E.2d 778. The manner of burial of Macaddino's body tended to show criminality in connection with the fact of his death, a necessary part of the *corpus delicti. Id.*

As to the photograph of the body as it lay on the autopsy table, there is an aspect of gruesomeness to this exhibit, as the photograph shows advanced deterioration of the tissues of the neck and lower jaw of the decedent. However, Dr. Alberhasky, the pathologist who performed the autopsy on the body, testified that he was unable to determine whether strangulation was the cause of death due to the deterioration of the neck and throat tissues. Certainly in a murder prosecution such testimony was relevant, and hence the admission of the photograph thus falls within the rule that it was admissible as evidence depicting an object or scene about which a witness would be permitted to verbally testify. *Askew, supra; Moore, supra; Drollinger, supra.* Though the exhibit is gruesome, we cannot say its gruesomeness clearly outweighs its probative value, and hence it was not error to admit it into evidence. *Askew, supra; Graves, supra; Brandon; supra.*

Appellant claims the trial court erred in replacing Juror No. 12 with an alternate on the morning of the last day of the trial when the trial judge discovered that the juror was about to be arrested by a Lake County police agency on an outstanding warrant. Appellant contends this was an abuse of discretion by the judge.

We disagree. Under Ind.R. Tr.P. 47(B) the trial court is empowered to "replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." The decision of the trial court whether to invoke T.R. 47(B) and replace a juror with an alternate is reviewable only for an abuse of discretion. *Landers v. State,* (1975) 165 Ind.App. 221, 331 N.E.2d 770. It can hardly be said the trial judge abused his discretion in replacing a juror who was about to be arrested and would face prosecution by the Lake County prosecutor, the same party who was prosecuting the defendant in the case in which the juror was sitting.

The trial court is in all things affirmed.

All Justices concur.